Stoddard *v.* Butler.

A *decree in chancery,* adjudging an *absolute sale of personal property* by a debtor to his creditor *fraudulent and void* under the statute as against creditors, *on appeal* was *affirmed* in the court for the correction of errors; the property transferred being deemed to be of a *value more than sufficient* to satisfy the debt of the vendee; the transfer having been made during the pendency of a suit by other creditors; and the vendor having *continued in possession,* disposing of the property as the *agent* of the vendee, and receiving a *compensation* for his services as such agent.\*

Appeal from chancery. The respondents filed a bill in chancery, before the vice chancellor of the fifth circuit, to *set aside as fraudulent* an assignment made by Stoddard, one of the ap-

---

\* The *affirmance* in this case was a *pro forma* affirmance; the members of the court being equally divided, viz. 12 for affirmance and 12 for reversal. Opinions were delivered by Judges Bronson and Cowen, and Senator Young, for affirmance, and by Senators Dickinson and Verplanck, for reversal. The statute having declared that every sale of goods and chattels, unless accompanied by an *im-*

Stoddard *v.* Butler.

pellants, to Thurber and Townsend, the other appellants in this case. The respondents being creditors of Stoddard, commenced a suit in *January*, 1834, for the collection of the demand due to them. In *May* they recovered judgment for $727.57, and on the *tenth* day of the same month issued an execution to the sheriff of *Lewis* county, where Stoddard resided, which, on the

*mediate delivery*, and followed by an *actual* and continued *change of possession*, shall be presumed to be fraudulent and void as against the creditors of the vendor: the *judges* held, in the opinions delivered by them, that a sale of chattels unaccompanied by an immediate delivery, and followed by an actual and continued change of possession, is *fraudulent* and *void* under the statute, although it be made openly, in good faith, and without any intent to defraud, unless there be something in the circumstances of the case rendering a change of possession *impracticable*, either from the nature or situation of the property, or the peculiar circumstances of the parties: in other words, that where there is no change of possession unless it be shown that there was a *necessity* or a *manifest fitness* and *propriety* for the continuance of the possession by the vendor, independent of benefit to him, the sale is *void;* that nothing can take the case out of the operation of the statute, unless the *attempted explanation* relate to the *possession* of the property; that the *bona fides* of the transaction, and the *absence of all intent to defraud*, is not enough to render the sale valid. In the views of the judges, Senator YOUNG concurred.

On the other hand, Senators DICKINSON and VERPLANCK, in the opinions delivered by them, held that though a sale unaccompanied by a change of possession is declared by the statute to be *prima facie* fraudulent and void, still if it be shown that such sale was *publicly* made, in *good faith* and *without any intent to defraud* creditors or purchasers, for a *fair* and *full consideration*, and that the motives for *leaving the property* in the possession of the vendor are such as ordinarily influence honest men, the presumption of fraud is destroyed, and the sale must be deemed valid. They also held, that in cases of this kind the question of *fraudulent intent* (in a court of law) is to be passed upon *exclusively* by the *jury;* that whilst it is the province of the *court* to determine upon the *relevancy* of evidence offered in the case, none offered having a direct bearing upon the question of *bona fides* should be excluded from the consideration of the jury, by the application of general rules of policy or of legal presumption growing out of the want of change of possession.

Upon the circumstances of *this* particular case, the *judges* and *Senator* YOUNG on the one hand, and *Senators* DICKINSON and VERPLANCK on the other, differ in their views of the *fairness* of the transaction, and the circumstances relied on to excuse a want of change of possession: the former holding that the property transferred was *disproportioned* in value to the amount of the debt intended to be satisfied; and that the *motives* for leaving the property in the possession of the vendor were not such as could be approved. Whereas the latter senators hold directly the reverse upon both points.

Stoddard *v.* Butler.

*twenty-sixth* day of May, was returned by the sheriff *nulla bona.* In the interim between the commencement of the suit by the respondents and the recovery of the judgment, to wit, on the eighth day of *March,* Stoddard executed an *absolute* assignment of the remainder of a stock of goods which he had on hands as a merchant, and of certain notes and accounts to Thurber and Townsend, *for and towards* the payment and satisfaction of a debt of $675, due to them. The *goods* thus assigned were valued at $435, and the amount of the notes and accounts was $927.83, which were esteemed good, at least, for $681. The goods consisted of many parcels of small value, separately, and the notes and accounts were against numerous persons, and principally for small amounts. The goods and notes and accounts were *left in the possession* of Stoddard, who was authorized by Thurber and Townsend, as their *agent,* to sell and dispose of the goods for cash or good security, and to collect the notes and accounts, and they agreed to pay him a *fair compensation* for his services ; and he accordingly acted as such agent until the thirteenth day of *June,* 1834, when Thurber and Townsend removed the goods then on hands to *Utica,* where they resided, and at the same time took possession of the notes and accounts which remained unpaid. After the assignment, and up to the time of the removal of the goods to Utica, Stoddard had sold goods to the amount of $77, and had received on the notes and accounts and for goods sold, the sum of $122. It was admitted by Stoddard that he had no property other than that assigned, except his household furniture, valued at $150 ; and it was proved that he had no visible means of supporting himself and family other than his business as a merchant ; that after the assignment, he continued in his store, trading as usual, until the goods were removed to Utica, and that no difference was observed in the management of the store after the assignment from what had been usual previous to that event. Two witnesses who were examined on the part of the complainants below, and they both testified that they resided in the same town with Stod-

dard, and heard of the assignment about the time that it was made. The bill in this case was filed on the 18th *June*. Previous to that time, to wit, on the 21st *May*, the complainants demanded of the defendants, Thurber and Townsend, an assignment of the notes and accounts which they had received of Stoddard, and offered to pay to them the amount due to them from Stoddard, deducting the value of the goods and such moneys as had been paid on the notes and accounts. The defendants, Thurber and Townsend, refused to accede to the proposition, but offered on their part to yield up to the complainants the property assigned by Stoddard, accounting for such portions thereof as had been converted into money, on the complainants paying the debt due to them from Stoddard, with the interest thereof and the expenses they had incurred : which offer was declined by the complainants. The defendants denied all fraud or intent to defraud, or secret trust for the benefit of Stoddard.

The vice chancellor, on hearing the cause on the pleadings and proofs, *dismissed* the bill. The complainants appealed to the chancellor, who *reversed* the decree of the vice chancellor, adjudged the assignment to be *fraudulent* and *void* as against the complainants, and set the same aside. He also directed an account of the goods assigned by Stoddard in the possession of Thurber and Townsend *at the time of the issuing of the complainants' execution*, and of the debts and choses in action assigned which had not been collected *previous to the filing of the bill*, and of the moneys received on account of such debts since the filing of the bill. The following is the opinion delivered by the CHANCELLOR :

" Upon a careful examination of the answers of the defendants, and the evidence in this case, I think the conclusion of the vice chancellor that the assignment of Stoddard's property was not fraudulent, was erroneous. Independent of the legal presumption of fraud, arising from his continuance in possession after the execution of the absolute bill of sale, I think the amount of property assigned was, at its fair value, much more than sufficient

Stoddard v. Butler.

to pay the debt due to the purchasers. The case would have been somewhat different, if Thurber and Townsend had taken the property in absolute satisfaction of their debt and at their own risk, or if they had taken an assignment of the property in trust for the other creditors, after securing to themselves a preference in payment out of the same. But as I understand the transaction, the bill of sale to them was absolute, so as to give them the full benefit of all the property and debts assigned, if the amount realized therefrom should be more than the amount of their debt, but to be applied to the extinguishment of their debt *pro tanto* only, if the proceeds of the assignment should for any reason turn out to be less.

As the nominal amount of the goods and debts assigned was more than double what was actually due to Thurber and Townsend, I can see no reason for the making of an absolute sale and assignment of all his property to them without any risk of loss on their part, unless it was upon some secret or implied understanding between the parties to that transaction to keep the surplus from other creditors for the benefit of Stoddard himself. Besides, there never was in fact any change of the possession of the assigned property, until after the issuing of the complainant's execution, as the nominal appointment of the seller as the agent of the buyers to retain the possession and retail the goods and collect in the debts for them, without any visible change in the mode of doing business at the store, was not a change of possession within the intent and meaning of the statute on this subject. The sale must be accompanied by an actual and continued change of possession, as well as a nominal and constructive change, or the transaction will be deemed fraudulent as against creditors. A construction which would allow the vendor or assignor of a store of goods to continue in possession thereof, and to sell them out as the agent of the purchaser, or assignee, would render this statutory provision for the prevention and detection of frauds a mere nullity. For these reasons, the decree of the vice chancellor must be reversed, with costs."

From the decree of the chancellor, the *defendants* below appealed to this court, where the cause was argued by

*W. Crafts & S Stevens,* for the appellants.

*C. P. Kirkland & S. Beardsley,* (attorney general,) for the respondents.

*Points on the part of the appellants :*

I. The assignment to Thurber and Townsend, in payment and satisfaction of their debt, is good and valid, and not fraudulent. They gained a preference, which the law allows. *Hall* v. *Tuttle,* 8 *Wendell,* 375. *Gardner* v. *Adams,* 12 *id.* 297. *Loop* v. *Comstock,* 15 *id.* 244. 19 *Johns. R.* 222.

II. No more than a reasonable amount of property was assigned in payment of the debt. The goods assigned were remnants of an old stock, from which Stoddard had been selling the previous winter ; and the debts assigned were against one hundred and ten persons, in small sums, scattered over the whole county of Lewis, and it probably would cost one-half of the amount to collect them. Thurber and Townsend, at the time the assignment was made, had no reasonable ground to believe that the property assigned to them would be more than sufficient to pay their debt ; they had a perfect right to insist upon an ample amount, without running any risk. *Peck* v. *Burdett,* 1 *Paige,* 309.

III. If the respondents supposed that more property was assigned than sufficient to pay the debt of Thurber and Townsend, they might have framed their bill with a double aspect : first, to set aside the assignment, and if that was not done, then that the surplus, if any, might be applied in payment of their debt. *Cunningham* v. *Freeborn,* 11 *Wendell,* 257, *in Court of Errors, by Ch. J. Nelson.*

IV. Before the bill was filed in this cause, Thurber and Townsend offered to give up to the respondents all the property assigned, if they would pay their debt. This proposition was refused ; and the only reason which can be assigned for the refusal, is that they knew Thurber and Townsend had no more than was sufficient to pay their debt.

V. The appellants, in their answers, deny any fraudulent intent, or any secret or implied understanding between them, or either of them, at the time the assignment was executed, that any part of the property assigned was to be retained by Thurber and Townsend for the future benefit of Stoddard, or for his use, or for the benefit of any other person; and there are no facts or circumstances attending the transaction, nor any proof to show that they had any such intent.

VI. The two witnesses examined in this case testify as to the value of the goods, but at the same time say that they never examined the quality of the goods and knew nothing about them. They merely gave their opinion from looking at the inventory, and what such description of goods would be worth in Lewis county, without taking into consideration that the appellants would be under the necessity of taking the goods back to Utica, where they were purchased, and selling them for what they could get. They also testify as to the character of the debts, from their impressions, that they, living in the county of Lewis, and doing business there, as merchants, might, by management, collect a great proportion of the debts.

VII. The goods assigned did not remain in the possession of Stoddard after the assignment, but passed by the assignment, and were in *law* and in fact delivered to Thurber and Townsend, who had the same right to appoint Stoddard that they had to appoint any other person their agent for the purpose of selling the goods. The sale by Stoddard was notorious in the neighborhood. Stoddard acquired no false credit by being the agent to sell the goods. He could do better for the assignees than a stranger. Thurber and Townsend resided at Utica—a distance of about seventy miles—and at that season of the year could not very well remove the goods, and they had every reason to suppose that they would sell better at Lowville than at Utica. *See* 19 *Johns. R.* 222.

*Points on the part of the respondents:*
The decree should be affirmed, and the assignment from Stod-

dard to Thurber and Townsend should be declared fraudulent and void, for the following among other reasons :

1. Because the assignment is absolute, and makes no provision for the payment of other creditors, after payment of the debt of Thurber and Townsend. *Beck* v. *Burditt*, 1 *Paige*, 309.

2. It is not in full payment and satisfaction of the debt of Thurber and Townsend, but only *for and towards* the payment of that debt.

3. Because an unreasonable amount of property and debts to pay the appellants, Thurber and Townsend, is assigned. *Beck* v. *Burdett*, 1 *Paige*, 309. *Rob. Fraud. Con.* 547, *n. b. and cases cited. New. Cont.* 371.

4. Because it necessarily results from the above, that, even if it be conceded that *in part* the assignment may have been for good consideration, yet, as to the *remainder*, it was a mere *voluntary gift*, and consequently void ; and it is well settled that a conveyance void in part by statute is void *in toto*. 5 *Cowen*, 547. 4 *Paige*, 24.

5. If not deemed void, by reason of the *voluntary gift*, as above stated, the enormous excess of value conclusively implies " a secret trust and confidence " for the assignor, and for this reason the assignment is void. 2 *R. S.* 135, § 1.

II. The property and debts mentioned in the assignment were suffered by Thurber and Townsend to remain in possession of Stoddard, and to be sold, collected, kept, used and controlled by him, and for that reason the assignment is fraudulent and void, as to the respondents. 2 *R. S.* 70, § 5, 2d ed. *Id.* 72, § 1. *Cunningham* v. *Freeborn*, 3 *Paige*, 564 ; *affirmed in Court of Errors*, 11 *Wendell*, 251, 2, 3, 4. *Randall* v. *Cook*, 17 *id.* 53, *and cases cited.* 2 *id.* 599. 1 *Esp.* 205. 1 *Campb.* 332. 4 *Johns. R.* 598. 2 *Wendell*, 449. *New. Cont.* 371. *Rob. Fraud. Con.* 547.

III. The whole spirit of the statute of frauds, and the whole policy of the law forbid that this assignment should be upheld.

After advisement, the follwing opinions were delivered :

By Mr. Justice BRONSON. Within the two and a half centu-
ries which have elapsed since the legislature first came to the aid
of the courts for the suppression of frauds against creditors,
there has never been a time when this transaction could stand the
test of a judicial investigation. The badges of fraud attending and
following the sale are plain and decisive, and the respondents,
who are judgment creditors of Stoddard, are well entitled to the
relief which has been granted by the court of chancery.

1. The assignment was made " for and towards," and not *in
satisfaction* of the debt. The appellants allege in their answer
that it was taken in satisfaction ; but this is a new gloss put
upon the transaction when they were called into court—it is not
the language of the written contract.

2. It was a sale of all Stoddard's property ; and the value of
the property was nearly double the amount of the debt of the
appellants, Thurber & Townsend. The goods included in the
assignment amounted to $435.89, and the debts, excluding all
that were either " bad" or " doubtful," to $878.43—making in
all $1314.32. The debt on account of which the sale was made
was only $675. The appellants are merchants ; they agreed on
the value of the goods at the time the assignment was executed,
and they cannot now change the character of the transaction by
urging that they got only the remnant of a country store. And
besides, nothing but argument is offered ; there is not a word of
proof that the goods were not of the full value agreed upon by
the parties at the time. We are not at liberty to speculate in
such a case, but must decide according to the pleadings and
proofs. Without going any further, we have here sufficient
evidence of a secret trust between the parties, injurious to third
persons. The sale was absolute ; the property greatly exceeded
in value the amount of the debt, and no provision was made for
other creditors. Thurber & Townsend might legally secure a
preference to themselves, but they had no right to go beyond
that, and stand in the way of others. The assignment was direct-

ly calculated to hinder, delay and defraud creditors, and was void within the express words of the statute.

3. The sale was made pending a suit brought by the respondents for the collection of their debt. The vendees knew before the sale that the respondents were creditors of Stoddard, and they do not deny that they knew of the pendency of the respondents' action before the assignment was executed.

4. There was no change of possession. The property remained in the hands and under the control of the vendor, and he was permitted to act as owner as fully after the sale as he had done before ; and what is very remarkable, no explanation whatever of this cogent evidence of fraud is attempted in the answer. What we heard on the argument about the probability of bad roads on the 8th day of March, when the assignment was executed, was a matter of argument only ; the appellants have offered no such excuse in their sworn answer. Continued possession in the vendor after an absolute sale of goods, when wholly unexplained, has always been held, not only *prima facie* but conclusive evidence of fraud as against creditors and purchasers. There is no case to the contrary in the books.

But it is said that the vendees made the vendor their agent, and that the possession of the agent is the possession of the principal. This is not a new device to get round the statute ; but if it succeed, this will be a new and most fortunate era for fraudulent debtors. They can place their goods beyond the reach of creditors and still retain the beneficial enjoyment, provided the friend who takes the transfer will declare the vendor his agent. Such an attempt to cheat the law cannot succeed. In *Sands* v. *Codwise,* 4 *Johns. R.* 593, the question related to real estate, where possession is much less important than it is in relation to personal property. Yet this court thought it strong evidence of fraud that the grantor continued after the sale to exercise acts of ownership by selling and leasing lots. The remark of *Kent,* Ch. J. in that case, in relation to the allegation that the vendor acted as the agent of the vendee, is not wholly inappropriate in the case at bar. " The attempt to screen these constant, essential and con-

Stoddard *v.* Butler.

clusive acts of ownership, under the authority of an agent, is a shallow artifice, destitute even of the merit of plausibility." There must be an actual and substantial change of possession ; a divided enjoyment, which leaves the vendor to appear to the world as owner, will not answer. In *Paget* v. *Perchard*, 1 *Esp. R.* 205, the plaintiffs, on taking a bill of sale of a Mrs. Spencer, who kept a public house, put a third person in possession. But it appearing in evidence that the vendor had been permitted to sell liquor in the usual way of her trade, Lord Kenyon held the sale void as against creditors, and nonsuited the plaintiffs. In *Wordall* v. *Smith*, 1 *Camp.* 332, the assignee put a servant in possession, but the assignor still continued to carry on the business. Lord Ellenborough said, it was a mere mockery to put in another person to take possession jointly with the former owner of the goods. He added, that a concurrent possession with the assignor is colorable. There must be an exclusive possession under the assignment, or it is fraudulent and void as against creditors. These decisions were made under the statute 13 Eliz. ch. 5, which we long since enacted. But we have now a new additional provision on this subject, which ought to be conclusive with those whose business it is to administer, not to make the laws. Our present statute requires, in terms, an " immediate *delivery* " and an " *actual* and continued *change* of possession " of the thing sold. Until this law is repealed, we are not at liberty to say that a mere *constructive* possession in the vendee, and especially one which leaves the vendor to act as owner, will defeat the claims of a *bona fide* creditor.

5. The property was not only left in the possession of the vendor, and he permitted to act as owner, but there was a secret trust between the parties, or one not appearing on the face of the assignment, that the vendor should have the possession, and derive a personal benefit from the enjoyment of the property. The answer states that Stoddard was to act as agent for the vendees and to receive a fair compensation for his services. He acted a little more than three months, and during that time sold goods and collected debts to the amount of only $122 ; a sum

which could not be more than " a fair compensation for his servi-
ces." Practically this was a trust that Stoddard should continue
to carry on the business as usual, and put the money in his own
pocket.

This transaction exhibits nearly all the signs and marks of
fraud which are mentioned in *Twyne's case,* as well as a disregard
of the important advice given by Lord Coke on that occasion as
to the proper mode of taking a gift or conveyance in satisfaction
of a debt.    3 *Coke,* 80.

I have noticed several objections to the validity of this trans-
fer, because they were presented by the case, and I was not at
liberty to pass them by.    But I desire to examine the transaction
a little further, on the single ground that there was no change of
possession.

This is not a mortgage ; it is an absolute bill of sale, and con-
tinued possession in the vendor is utterly inconsistent with the
deed.    There was nothing in the nature or situation of the pro-
perty, or the circumstances of the parties, to prevent an imme-
diate change of the apparent ownership.    In such cases it has
been held, with great uniformity, both in this country and in
England, that the sale is fraudulent and void as against creditors.
In *Twyne's case,* 3 *Coke,* 80, which arose soon after the passing
of the statute 13 *Eliz.* it was one of the principal badges of
fraud, that the donor continued in possession and used the goods
as his own ; and Lord *Coke,* in his advice to the donee says :
" Presently after the gift, take possession of the goods, for con-
tinuance of possession in the donor is a sign of trust." In *Buck-
nal* v. *Roiston, Prec. in Ch.* 287, Sir Edward *Northey* said, it
had been ruled forty times in his experience at Guildhall, that if
a man sold goods and still continued in possession as visible
owner of them, such sale was fraudulent and void as to creditors,
and that the law had always been so holden.    The same thing
was held by Lords *Kenyon* and *Ellenborough,* in the cases already
cited, and was solemnly adjudged by the king's bench, in *Ed-
wards* v. *Harben,* 2 *T. R.* 585, where *Butler,* J. declared the
unanimous opinion of all the judges, that unless possession

Stoddard *v.* Butler.

accompanies and follows the deed, it is fraudulent and void. He said the principle never admitted of any serious doubt.

In *Hamilton* v. *Russell*, 1 *Cranch*, 310, the supreme court of the United States laid down the same doctrine. *Marshall*, Ch. J. said, that fraudulent conveyances, which are made to secure to a debtor a beneficial interest, while his property is protected from creditors, will be most effectually prevented, by declaring that an absolute bill of sale is itself a fraud, unless possession accompanies and follows the deed. Such was also the opinion of *Tilghman*, Ch. J. in *Dawes* v. *Coke*, 4 *Binn.* 265. This rule was somewhat extended in *Sturtevant* v. *Ballard*, 9 *Johns. R.* 337, and applied to a case where there was an agreement in the bill of sale that the vendor should have possession for three months. The enjoyment by the vendor was not inconsistent with the face of the deed ; but *Kent*, Ch. J. said, " Delivery of possession is so much of the essence of the sale of chattels, that an agreement to permit the vendor to keep possession, is an extraordinary exception to the usual course of dealing, and requires a satisfactory explanation." The sale was declared void.

The cases in which it has been held that possession in the vendor did not necessarily render the sale void as against creditors, depended upon special and peculiar circumstances. Many of them are collected in a note of the learned reporter to the case of *Bissel* v. *Hopkins*, 3 *Cowen*, 189. They are cases of mortgages and conditional sales, where possession in the vendor was consistent with the deed, or where there were special and satisfactory reasons growing out of the nature and situation of the property, or the circumstances of the parties, for omitting to change the apparent ownership. They do not conflict with the general rule that an absolute sale without a change of possession, cannot be upheld where creditors are concerned.

The distinction taken by the courts between absolute and conditional sales, only served to change the mode in which fraudulent debtors attempted to place their property beyond the reach of creditors, while they still retained the beneficial enjoyment ; and mortgages took the place of absolute bills of sale. These

were sometimes upheld and sometimes they were overthrown ; in some of the cases it was said that fraud was a question of law for the court ; in others, that it was a question of fact for the jury. Some judges were of opinion that continued possession in the mortgagor was only *prima facie* evidence of fraud, while others thought it well nigh conclusive. This state of things rendered the chances about equal that a fraudulent debtor, after all means of coercion by imprisonment were abolished, might set his creditors at defiance with impunity. For these evils a remedy was most wisely, and I think successfully, attempted in the late revision of the laws. The legislature not only re-enacted the statute of 13 *Eliz. ch.* 5, declaring void all conveyances made with the intent to hinder, delay or defraud creditors, 2 *R. S.* 137, § 1, but they made an entirely new provision, covering the whole ground of controversy. 2 *R. S.* 136, §5. This section abolishes all distinction between mortgages and absolute sales, and places them both on the same footing. It then declares that the sale or assignment, *unless accompanied by an immediate delivery, and followed by an actual and continued change of possession,* shall be presumed fraudulent and void as against the creditors of the vendor. This presumption becomes conclusive evidence of fraud, if the vendee cannot make it appear that the sale or assignment was made in good faith and without any intent to defraud.

Notwithstanding this new and very explicit enactment, the courts have been strongly pressed to go back to the law of personal mortgages, as it stood previous to the year 1830 ; but they have steadily followed the plain and practical rule given by the statute, and held that there must in all cases be a change of possession, unless there be something in the circumstances of the case rendering the change impracticable. This construction, if indeed there be any such thing as construction where the language is unequivocal, is fortified by the seventh section, which expressly exempts from the operation of the rule contracts of bottomry or *respondentia,* and assignments and hypothecations of vessels, and goods at sea, or in foreign ports. These excep-

Stoddard *v.* Butler.

tions go very far to prove the extent of the rule which the legislature intended to establish by the fifth section.

Nothing can take a case out of the operation of this statute, unless the attempted explanation relate to the possession of the property. Although the sale be made openly before witnesses, and upon good and sufficient consideration, the answer of the statute is, *unless there be a change of possession, the sale shall be presumed fraudulent and void as against creditors.* The statute means as much as this, or it means nothing. Any other interpretation blots out the fifth section, and leaves us upon the re-enactment of the statute 13 *Eliz. ch.* 5. I need not refer to the cases on this subject since 1830. It is sufficient to say, that it is fully settled, so far as the repeated and uniform decisions of the supreme court can settle any question, that there must in all cases, when practicable, be a change of possession, or the transaction cannot stand. Nothing short of such a rule can effectually reach the evil against which the statute was directed; and that rule, as I have elsewhere had occasion to remark, is one of a most salutary tendency. Those who have been most conversant with courts of justice, must, I think, agree in this opinion, and will, I trust, be among the last who will consent to abandon the act of 1830. But it belongs to others to say whether the statute shall be repealed, and I will not trespass upon their jurisdiction.

I am of opinion that the decree of the chancellor should be affirmed.

By Mr. Justice COWEN. *Butler, McDonough & Co.* of Utica, being creditors of Simeon Stoddard, of Lowville, brought their suit against him in January, 1834, and recovered judgment in May term, for about $700, upon which a *fi. fa.* was issued which was returned *nulla bona.* Pending the suit, on the 8th of *March,* Stoddard, by bill of sale of that date, sold and assigned all his goods and choses in action, with some trifling exceptions, to *Thurber & Townsend,* of Utica, which sale and assignment were expressed in the bill to be *towards payment and satisfaction*

VOL. XX. 33

of a debt of $675. On the 18th *June*, Butler, McDonough & Co. filed their bill to set aside the sale. It is alleged by the bill, admitted by the answer, and established by evidence, that there was no actual change of possession, either as to the goods, or the notes, accounts, or other choses in action, until several months after the execution of the assignment. Upon such a state of facts, it cannot be denied that the sale and assignment were *prima facie* fraudulent and void in respect to the complainants and Stoddard's other creditors ; nor that, in the language of the statute, such possession of Stoddard " shall be conclusive evidence of fraud, unless it shall be made to appear on the part of the persons claiming under such sale and assignment, that the same was made in good faith, and without any intent to defraud such creditors." 2 *R. S.* 70, § 5, 2d *ed.*

Thurber and Townsend claim that they have established *good faith*, as the statute requires, by the facts set up in their joint answer with Stoddard. These are : That their claim of $675 was honestly due, and that Thurber took the bill of sale to himself and partner *in satisfaction*, being informed at the time that Butler, McDonough & Co. had brought their action ; that they left the goods, &c. in possession of Stoddard, as their agent, to sell and collect, &c. and agreed to pay him a fair compensation for his services. That he continued to act as such agent, from the 8th of March till the 13th of June, just before the bill was filed against them, when they took the undisposed residue of the goods, notes and accounts into their own possession. That the goods were, at the time of sale, put down in the inventory at $435.89, being the cost price, and were correctly estimated ; though they believed they should not be able to dispose of them at such price. That the debts assigned amounted to $1209.33 ; but they were unable to state what portion might be made available ; that in the course of about three months, Stoddard sold goods to about 77 dollars, and received on notes and accounts and for goods sold, 122 dollars. All fraudulent intent was denied, and they admit they knew Stoddard to be insolvent.

It was agreed by the counsel for the appellants, and in this

Stoddard *v.* Butler.

all the books concur, that one main step towards overcoming the legal presumption of fraud, is to satisfy the court that there was a necessity, or at least a plain propriety in leaving the goods and choses in action in the possession and under the control of this debtor after he had absolutely sold them. Several cases were read which deny that they can be arbitrarily left, or upon consideration of the vendor's own convenience or necessity. For this there are two reasons, one, that such an act is out of the ordinary course of business; and another, that it adds little to the security of the creditor, it being still in the debtor's power either secretly to convert the goods to his own use, or sell them to a *bona fide* purchaser, and use the avails, thus throwing the creditor back upon the same imperfect personal security, to which hardly anything can be added without an immediate change of possession. The matter is still worse where the debtor is allowed to retain the goods for the express purpose of selling them, and receiving the avails, under an agreement that he shall account for the money. The debtor openly keeps the property, sells it, and puts the money in his pocket, leaving the creditor to sue his insolvent depository, precisely as before the original debt. It was said in argument, that the goods could not well be removed to Utica, as the travelling in the month of *March* was probably bad. The sworn answer does not give that reason. Had it been so, and there was no other place of deposit nor salesman at Lowville, it might have formed a reasonable excuse for a few days. No difficulty of that kind existed when it was found, in *June*, that this bill was to be filed; and yet probably the roads were settled some time before. Nor is it said that this 400 or 500 dollars worth of goods could not as well, and certainly with much more safety to Thurber and Townsend, the creditors, have been deposited, and sold, if there was a necessity for such sale at Lowville, by some responsible person; and that too, in the language of the answer, for " a fair compensation."

The same remarks are, in a great measure, applicable to the choses in action. All are left with a man entirely irresponsible, either for the money actually collected, or for losses through care-

lessness or fraud.   It is said the claims were numerous, of small amounts, the debtors scattered in their residences, and Stoddard, from his acquaintance with them, better able than any other person to promote either voluntary or forced collections.   All this might have been so.   It is taken up as but matter of conjecture; and we are still left to suppose that there might have been other men of business at Lowville possessing nearly the same advantages.   If the transaction were honest, a little information from Stoddard would have supplied every deficiency in a neighboring agent probably more efficient, and certainly more responsible. No attempt was made to find other depositories or other agents. Stoddard continued in possession some three months, when all the choses in action, as well as the goods, were taken into the actual possession of Thurber and Townsend.

No commissions, no specific compensation for Stoddard's services were stipulated.   He was left to keep his own accounts, and made his own deductions for expenses.   Nor were the goods, &c. received *in satisfaction*, if we are to take the written recital in the bill of sale as evidence.   That states the assignment to have been *for and towards* the discharge of the debt.   The legal effect would be only to discharge so much of the debt as Stoddard should pay over; and as between him and his vendees, the expressed purpose could not easily be contradicted.

It was said in argument that the possession was changed to the vendees, within the legal rule, that the possession of the agent is that of the principal.   This would be to contradict by construction the words of the statute, which demands an *actual* change.   The possession of every vendor after sale is constructively the possession of the vendee; and, at least, the argument furnishes an answer, to the evidence of fraud, which can always be raised, by the parties clothing the possession with a contract of agency.

Taking the history of this transaction from the *answer itself*, it appears to me there is an air of looseness, generality and contradiction about it, at war with the idea that the parties were using Stoddard's means in good faith, and with an honest view

Stoddard *v.* Butler.

to the rights of his other creditors. I think they should at least be put to show so much, in order to overcome the stern inference of fraud which the law raises against them. The strength of the presumption is measured by the adjudged cases, the result of which was well expressed by Mr. Justice Bronson in *Randall* v. *Cook*, 17 *Wendell*, 56 : " Where the property is of such a nature that there may be an immediate change of possession that change must be made, or the law will pronounce the transaction fraudulent as against creditors and subsequent purchasers." I have sought in vain, through this answer, for materials which would take the case out of the rule thus laid down. It is true, the answer negatives generally all intent to defraud ; but the denial stands by the side of an admitted specific fact, which, being unexplained, the law has in terms declared incompatible with such a denial.

The defendants produced no witnesses, although their answer was put in issue by a replication, and proofs were taken on the part of the plaintiffs. By these, it appears pretty satisfactorily that the available debts assigned were not far from $900 in gross amount, which, added to the goods as valued by both Thurber and Stoddard, $435.89, make an aggregate of nearly double the debt they were assigned to satisfy. It is said the price of goods, as fixed by the schedule, is not conclusive. I should, however, think it very indiscreet in this court to conclude against it. Mr. Thurber was a merchant, valued the goods at cost, and swears in his answer that they were correctly valued : so do the other defendants ; and this derives confirmation from the witnesses who were examined on the part of the complainants. All is sought to be overturned by the general fact, that they were " the remnant of a country store." We are asked, with emphasis, what merchant would not rather have cash for his debt ? To answer the question, we are brought back to the value of the remnant, which is abundantly established by the best evidence ; and no one can deny that it is possible for a remnant to be of the value admitted by the parties on oath.

The expenses of collecting the debts were neither averred in

the answers nor established by other proof. In addition to Stoddard's conceded insolvency, it appears he was dependent for a livelihood on the business which he had nominally transferred, and, added to his own, were the necessities of his family. He might very naturally infer that Thurber and Townsend would have no objection to his retaining the excess beyond their debt ; and he was left to regulate that according to the dictates of his own conscience ; for they could enforce no collection against him. The offer of Thurber and Townsend, after being threatened with a suit, to surrender the fund on being paid their own debt, was accompanied with the alarming general addition that the expenses they had incurred should also be paid. If such a proposition in any shape were admissible to defeat a right of suit already attached, it could not but be known that the expenses incurred by an agency such as this, might seriously detract from the value of the fund. The surprise is rather that they should have refused to take the goods at their own valuation, with the money already collected, and allow the balance to be managed by persons so deeply interested as the complainants, in making the best of it for the benefit of all concerned.

Admitting that the debt due to Thurber and Townsend is correctly stated in the bill of sale, and that the agency of Stoddard was publicly known, (though there is but faint evidence of the latter,) yet these are slight circumstances when weighed against those of an opposite tendency. Altogether, so far from establishing good faith in the purchase of these goods and choses in action, to my mind the presumption of fraud, arising from Stoddard's possession after the sale, is considerably strengthened by other facts in the case.

My conclusion is, therefore, that the decree of the chancellor should be affirmed.

By Senator DICKINSON. In this cause two leading questions are presented : *First.* Was the transaction between Thurber and Townsend and Stoddard *fraudulent in fact*, designed to hinder, delay and defraud creditors ? *Second.* Was it such a transac-

Stoddard *v*- Butler.

tion as the *law declares fraudulent,* however honest the inten-
tion of the parties ? The stating part of the bill filed before the
vice chancellor is sufficiently comprehensive to justify the special
interrogatories under it. The defendants were required to answer
upon oath ; and such parts of their answer as are responsive to
the bill, in the absence of contradictory proof, must be taken as
conclusive evidence. We may then regard the honesty and fair-
ness of the transfer as fully established, for the appellants in
their answer severally deny all fraudulent intention and. every
secret trust.

It is insisted by the respondents that the amount of property
transferred by Stoddard to Thurber & Townsend was so grossly
disproportioned to the amount of their debt, as to be strong, if
not conclusive evidence of fraud, and if we are confined to the
mere footings of the figures without looking at the items, the
position would seem to be a true one. No principle is better
settled than that a debtor, in failing circumstances has a right to
prefer one creditor over another ; but he cannot convey or place
beyond the reach of others, more property than is reasonably
sufficient to pay the debt so preferred. But in the application
of this rule we should. have regard to the real and not the nomi-
nal value of the property transferred. The property transferred
to Thurber & Townsend by Stoddard was, as appears from all
the evidence, the winding up of a very miserable concern. The
inventory of goods presents the mere leavings of what was once
called an *assortment,* the merest refuse of a country store,
amounting, it is true, at fair cost prices, to $435.89. But what
merchant ever sold or expected to sell his entire lot of remnants
at cost ? The transferred debts amounted in the whole to
$1,219.28. Of this amount $681.05 were estimated good,
$197.38 collectable, $96.37 doubtful, and $234.53 bad. The
debt of Thurber & Townsend, to be paid from these goods and
debts and fifty dollars cash, was $725. Whoever has had occa-
sion to wind up a concern of this kind, needs not to be reminded
that after deducting the inroads upon his schedule from removals,
set-offs, insolvencies, costs of litigation and time and expenses,

he will not unfrequently find it a hard bargain even if he had received the whole as a gratuity. But in this case we are not left to mere speculation as to the value of the transferred property. It is admitted by the stipulation of the parties, that before the bill was filed, Thurber and Townsend offered to give up to the respondent all the property and debts they received by the assignment from Stoddard, upon payment of their debt against Stoddard and expenses of taking the property. This offer the respondents refused to comply with, thereby giving their judgment of the value of this property. The respondents allege in their bill of complaint, that the value of the property transferred by Stoddard to Thurber & Townsend is so far disproportioned to their debt against him, that it is evidence of fraudulent intent in the transfer. They ask this court to believe that which, it is very evident, they did not believe themselves. If, as they pretend, the property had been worth enough to pay both debts, or of any considerable value over and above the amount of the debt of Thurber & Townsend, they would have availed themselves of this offer, and not have entered a court of chancery for the mere purpose of vindicating justice. Besides, they would have framed their bill, which they have not done, so as to have, in any event, reached the surplus, after paying the debt of Thurber & Townsend, if they had supposed it was worth preserving. I am therefore clearly of the opinion that the transaction was honest and fair, and without intent to defraud ; and that the value of the goods and debts was no greater than was reasonably sufficient to secure, and ultimately pay the debt for which they were pledged.

The question then, which is presented, is one of much interest in the history of our jurisprudence. It early engaged the attention of the courts of England, and has been most fully reviewed in this and in most of the states of the union. The diversity of opinion entertained, not only by the profession but by learned judges, and the supposed contradictory position of authorities, would seem to justify a review of all the leading cases ; and I apprehend we shall find less conflict of authority than has gene-

Stoddard *v.* Butler.

rally been supposed; nor has the doctrine been changed, but is now substantially as it always has been since the law of the twelve tables of Rome.

The common law of England upon this subject was based upon the civil law; and the statutes of 13 and 27 Elizabeth, the first of which referred to *creditors* and the other to *purchasers,* were but declaratory of the common law. The same has been held the common law in this country, and the statutes of Elizabeth were substantially re-enacted here, and with trifling variations, have found their way into our Revised Statutes.

The earliest adjudged case which arose upon the subject of fraudulent assignments was *Twyne's case,* 3 *Co.* 80. This was a criminal proceeding in the star chamber, against Twyne, under the statute of 13 Elizabeth, for making and publishing a fraudulent gift of goods. One Pierce, being indebted to Twyne and also to C., the latter brought a suit against Pierce to recover his debt, pending which suit Pierce made a secret deed of gift of all his goods and chattels, real and personal, to Twyne, notwithstanding which Pierce " *continued in possession of the goods and some of them he sold, and he shore the sheep and marked them with his own mark.*" C. prosecuted his suit to judgment and execution; and the question was, whether the deed from Pierce to Twyne was fraudulent and of no effect. " And it was resolved by Sir T. Anderson, keeper of the great seal, and the whole court of star chamber, that the deed or " *gift,*" as it was called, was fraudulent: 1. For the reason that the gift was general, not excepting his apparel or any thing of necessity. 2. The donor remained in possession, and used them as his own, and traded and trafficked with others. 3. It was made in secret. 4. It was pending the suit. 5. The donor's possession was evidence of a fraudulent trust. 6. The deed contains that the gift was made honestly, truly and *bona fide.* This case seems to have been decided upon the ground that the possession of Pierce, treating the property as his own, and trading and trafficking therein, was evidence of a secret, fraudulent trust. This, the court say, is evidence of an agreement that the " *donee should deal favorably*

*with him in regard to his poor estate"—that it shall not be called bona fide, because it was a sign of trust.*

In the case of *Paucefoot,* who being indicted for recusancy for not coming to divine service, with intent to defeat the queen of what might accrue to her, made a gift of all his goods, for a feigned consideration, and after grave deliberation by all the barons in the exchequer chamber, this conveyance was held to be void.

In the case of *Stowe* v. *Grubham,* 2 *Buls,* decided by Lord Coke previous to 1656, a distinction was taken between an absolute and a conditional sale, his lordship saying, " when the conveyance is *conditional,* continuance in possesion after this shall not be said to be fraudulent, and this is very clear." But in *Ryal* v. *Rollee,* 1 *Atk.* 165. Mr. Justice Burnet, in construing the statute of 13 Eliz. says, " there is no distinction between *sales absolute* and *conditional* ; courts of equity and juries are to consider upon the whole evidence, whether the conveyance was made with a view to defraud or not ;" and he adds, " when the goods or deeds have been left with the vendor so notoriously that there could be no design to defraud, this has never been looked upon as fraudulent."

In *Cadogan* v. *Kennett,* 2 *Cowp.* 435, Lord Mansfield says, "A fair voluntary conveyance may be good against creditors, notwithstanding it is voluntary. The circumstance of a man's being indebted at the time of his making a voluntary conveyance, is an *argument* of fraud. The question, therefore, in every case is, whether the act done is a *bona fide* transaction, or whether it is a trick and contrivance to defeat creditors. The statute ought not to be so construed as to make innocent parties suffer."

In *Leonard* v. *Baker,* 1 *Maule & Sel.* 255, it was held, that " as the assignment was notorious in the neighborhood, and the creditor claiming had notice of it, it was not void."

In *Watkins* v. *Birch,* 4 *Taunt.* 823, Lord Mansfield says, " Can we say that a person who has bought goods under an execution may not let them to the former owner of them ? No case has gone so far as that."

Stoddard *v.* Butler.

Mr. *Shepherd*, in his *Touchstone*, *p*. 65, commenting upon the statute of Elizabeth, and speaking of deeds of conveyance, says, " All such as are made *bona fide* and upon *good consideration*, are not to be accounted fraudulent by this statute.   But if, hanging a suit, a deed is *secretly made* and the vendor continues in possession, it is void."

*Starkie*, in his Treatise upon Evidence, says, " When fraud may be collected from the instrument itself, or from the deed coupled with extrinsic circumstances and the situation of the parties, it is a question of law arising from the facts so found ; but when it depends upon *intention*, the existence of that intention must be found by the jury.   2 *Starkie's Ev.* 616, 617, *part* 4.

In *Kidd* v. *Rawlinson*, 2 *Bos. & Pul.* 58, Kidd bid off Auburn's goods at sheriff's sale, and left them with him.   Lord Eldon said, " If Kidd had lent money to Auburn to buy these goods, and had then taken a conveyance of them as security for his debt arising out of the mere act of lending the money, leaving Auburn in possession of the goods, would not have been a fraudulent act." And *Buller*, in his *Law of Nisi Prius*, 258, says, " But yet the donor continuing in possession is not in all cases a work of fraud, as where a donee lends his donor money to buy goods, and at the same time takes a bill of sale of them for securing the money."

But the case of *Edwards* v. *Harben*, 2 *T. R.* 587, decided in the court of king's bench, in the reign of George III. seems to have been invoked as authority for almost every variety of decision upon this subject.   This decision has been seriously questioned, both in the court where it was pronounced, and in this country : but if we except the distinction it takes between *sales absolute* and *conditional*, I am unable to discover any thing in the opinion of the court inconsistent with the plainest principles of justice and law.   The case has been misunderstood, as well by those who have arraigned it, because of its extraordinary rigor, as by those who have claimed its authority for a principle which it does not contain.   It presents the following facts : Mercer was indebted to Edwards, the plaintiff, in the sum of £22 18*s.* 6*d.*,

and also to Harben, the defendant, in the sum of £191. On the 27th March, 1786, Mercer gave to Harben a bill of sale of all his goods, &c. in his house at Lewes, specifying the articles. The bill of sale was absolute on its face, but there was a verbal agreement that Harben might take the goods and sell them at the end of fourteen days, refunding the surplus money. The goods were left with Mercer, but one cork screw was delivered in the name of the whole. The goods remained in the possession of Mercer until his death, which took place 7th April, 1786, and on the day following, Harben entered and took possession of the goods, and sold them under his bill of sale. Edwards prosecuted him as executor in his own wrong. At nisi prius, a verdict was rendered for Edwards, subject to the opinion of the court. In pronouncing the opinion of the court, *Buller,* Justice, cites the case of *Bamber* v. *Baron,* decided by the same court at a previous term, but which was touching an assignment made for the benefit of such creditors as would sign a deed of composition within a certain time ; and says, " In that case, the court were unanimously of opinion that unless the possession *accompanies and follows the deed,* it was fraudulent and void." But in pronouncing the judgment of the court in the case then at bar, he cites the case of *Stone* v. *Grubham,* with approbation, and says, " The court there held, that an *absolute conveyance* or gift of a lease for years, unattended with possession, was fraudulent, but if the deed or conveyance be *conditional,* then the vendor's continuing in possession does not avoid it, because by the terms of the conveyance, the vendee is not to have possession till he has performed the condition. Now, here, the bill of sale was on the face of it *absolute,* and to take place *immediately,* and the possession was not delivered, and that case makes the distinction between deeds or bills of sale which are to take place immediately, and those which are to take place at some future time. For in the latter case, the possession continuing in the vendor till that future time, or till that condition is performed, is consistent with the deed, and such possession comes within the rule as accompanying *and following the deed.*" And he adds that which

I trust no one is disposed to controvert : " This cause has been argued by the defendant's counsel, as being a case in which the want of possession is only *evidence of fraud*, and that it was not such a circumstance *per se*, as makes the transaction fraudulent in law ; that is the point which we have considered, and we are all of opinion that *if there is nothing but the absolute conveyance without the possession, that in point of law is fraudulent.*"

The late Chancellor Kent, in his commentaries upon the English cases, 2 *Kent's Comm.* 520, says, " The conclusion from the recent English cases would seem to be that though a continuance in possession by the vendor or mortgagor, be *prima facie* a badge of fraud, yet the presumption may be rebutted by explanations, showing the transaction to be fair and honest, and giving a reasonable account of the retention of possession. The question of fraud, in such cases, is not an absolute inference of law, but one of fact for a jury."

In the case of *Hamilton* v. *Russel*, 1 *Cranch*, 310, decided in the supreme court of the *United States*, Robert Hamilton executed to his brother, Thomas Hamilton, 4th *January*, 1800, an absolute bill of sale of a slave ; Robert Hamilton continuing in possession. Russel, a judgment creditor of Robert Hamilton, caused the slave to be taken in execution in *July* 1801, and was prosecuted by Thomas Hamilton, who claimed the slave under the bill of sale. No excuse or explanation whatever was given or attempted, and the jury very properly returned a verdict for the defendant. In pronouncing the decision of the court upon a motion for a new trial, the chief justice reviews the leading English cases, adopts the reasoning of *Buller* J. in *Edwards*, v. *Harben*, and concludes by saying, " this court is of the same opinion. We think the intent of the statute is best promoted by that construction ; and that fraudulent conveyances, which are made to secure to a debtor a *beneficial interest* while his property is protected from creditors, will be more effectually prevented, by declaring that an *absolute* bill of sale is of itself a fraud, *unless possession accompanies and follows the deed.*" The statute of *Virginia* construed in this case was the same as the statutes of

13 and 27 *Elizabeth* ; and with the exception of the artificial distinction taken by the court between absolute and conditional sales, which, if it ever existed, has been abolished by the Revised Statutes, the conclusion of the court is in accordance with the principles for which I contend. I admit, most fully, that where there is " *nothing but the absolute conveyance without the posses-sion,* that, in point of law, is fraudulent ;" and also, that " *frau-dulent conveyances which are made to secure to a debtor a beneficial interest, while his property is protected from creditors, is of itself a fraud,*" whether the possession accompany the deed or not. A bill of sale, whether absolute or conditional, intended to secure to the debtor a beneficial interest, and protect his property from creditors, is clearly fraudulent ; nor will the fact that the possession accompanies the deed make it honest and *bona fide.*

In *Phetteplace* v. *Sayly,* 4 *Mason,* 321, Justice *Story* says, where a party, who is owner, sells personal property *absolutely,* and yet continues to retain the visible and exclusive possession, the law decrees such conduct a constructive fraud upon the public. To be fraudulent in law, it must be such a transaction as is necessarily at war with good intentions and against good faith." But here, again, the abstract proposition only is decided, whether an *absolute* sale of chattels is *prima facie* void, unless the vendee take actual possession ; the question, whether the party was not at liberty to explain the reasons why the vendor continued in possession, not being presented to the court.

This doctrine has undergone a most thorough and able review in the state of *Massachusetts.* In the case of *Brooks* v. *Powers,* 15 *Mass. R.* 244, one Will sold to Brooks a yoke of oxen, con-tinuing in possession. Powers, a creditor of Will, caused the oxen to be seized on attachment. Brooks brought trover, and obtained a verdict for the value of the oxen ; and upon a motion by the defendent for a new trial, on the argument of which all the ancient and modern cases were cited, the chief justice says: " It has been contended in this case, that the possession of the vendor of personal chattels after the sale, is conclusive evidence in favor of creditors that the sale was fraudulent; or rather, that

Stoddard *v.* Butler.

it is itself a fraud. But we are all of opinion, that although it is evidence of the strongest kind, it is not conclusive. The vendee may, notwithstanding, upon proof that the sale was *bona fide* and for valuable consideration, and that the possession of the vendor, after such sale, was in pursuance of some agreement not inconsistent with honesty in the transaction, hold under his purchase against creditors : and so it has been often decided in this court, as well as in England." In the same court, in the case of *Bartlett* v. *Williams, Pick.* 295, Putnam, J. says : " It is certainly a general rule, that the possession must accompany and follow the deed, and that the possesion of the vendor, after the bill of sale, *unexplained*, would render the conveyance void as against creditors. But such a possession may be explained, and may be perfectly consistent with justice."

The same doctrine has been held in *New-Hampshire.* In *Homer* v. *Lane,* 2 *N. Hamp. R.* Mr. Justice Woodbury says : " In fine, possession of property being retained by the vendor, after a sale, is not *per se* fraud ; but, in the language of Lord Mansfield, being only evidence of fraud, may be explained. The whole circumstances should be submitted to the jury, and from all parts of the transaction, taken together, it should be determined whether the contract of sale was or was not fraudulent in the concoction of it." In *Coburn* v. *Pickering,* 3 *N. Hamp. R.* 425, Ch. J. Richardson, in delivering the opinion of the court, says : " After a most attentive and careful examination of the books on this subject, we have not been able to entertain a doubt, that the true rule to be deduced from all the adjudged cases is, that where the sale is *absolute*, possession and use of the good afterwards by the vender *is always, unexplained, conclusive evidence of a trust."* In this case all the English cases were cited and reviewed ; and the court, in concluding their opinion, hold, what I believe always has been, is now, and ought hereafter to be the law, viz. " that such possession in the vendor may always be explained ; but if not explained, should be adjudged fraudulent in law." It was further held by the same court, in *Ash.* v. *Savage,* 5 *N. Hamp. R.* 545, that " where a chattel has been mortgaged, pos-

session by the mortgagor may in some cases be evidence of fraud, but is never a fraud in law, or conclusive evidence of fraud."

The leading cases in *Connecticut* seem to indicate a more rigid rule than has obtained in most of her sister states, without perhaps intending to carry the doctrine further. They recognize, and I think partially extend the case of *Edwards* v. *Harben;* but in *Potter* v. *Smith,* 5 *Conn. R.* 201, Ch. J. Hosmer adopts the reasoning of the supreme court of this state in the case of *Sturtevant* v. *Ballard,* 9 *Johns. R.* 337.

In *North Carolina,* where this class of cases has been elaborately reviewed, it was held in the case of *Vicks* v. *Keys, Haywood's N. Car. R.* 126, that " The property ought to accompany and follow the deed ; but, (says Judge Taylor, in delivering the opinion of the court) I cannot agree that the property going otherwise as to its possession than the deed points out, is absolutely fraud." In *Trotter* v. *Howard, Hawks' N. Car. R.* 322, Judge Hall, in delivering the opinion of the court, after citing the case of *Edwards* v. *Harben,* says : The statute of *Elizabeth* declares that all conveyances made with intent to defraud creditors shall be void and of no effect ; and whether a conveyance comes within the operation of the statute, whether it is made with intent to defraud creditors, or not, is a question of fact, which, under all the circumstances of the case, properly belongs to a jury to decide. It is a matter of fact, and not a question of law."

In *South Carolina,* in the case of *Terry* v. *Belcher,* 1 *S. Car. R.* 573, in speaking of the rule that possession must accompany the deed, and the difficulty and injustice of maintaining it, the court say : " In other instances the strong arm of the law has been able to enforce the rule for a time, but even this engine becomes powerless when opposed to the will of a whole community, and the rule is only remembered for the injustice it has done ; a wise lawgiver should, therefore, enquire whether the rule proposed, even to give effect to a correct principle, is calculated to promote justice and the happiness of mankind. Those who maintain the opposite side of the question, predicate their

Stoddard *v.* Butler.

argument on the facility for practising frauds through this means, and the difficulty of tracing them out ; and I agree there is much truth and good sense in the argument. But the security is found in a jury drawn from the atmosphere of the transaction, and the suspicion of the law throws the burthen of proof upon the purchaser." After citing a number of cases in support of this doctrine, they conclude : " It is the voice of mankind, repudiating a policy at war with their feelings, and one which courts of justice must respect." The same doctrine was most emphatically maintained in the case of *Smith* v. *Henry* 2, *Bailey's S. Car. R.* 119, the court saying, " the jury ought to be charged that possession in the vendor is *prima facie* evidence of fraud, and leave the explanation to them."

In *Tennessee*, White, J. in the case of *Ragan* v. *Kennedy*, 1 *Tenn. R.* 100, held, ". Whether there be fraud or not, the jury must determine from the evidence. The law considers various circumstances as evidence of fraud : as when a bill of sale is made secretly and not in the usual way ; where a suit is pending against the person conveying ; when made by one relative to another, or when the person making it uses the property afterwards as his own, and when a bill of sale on its face is *absolute* and is not followed by a possession of property, it is void."

In *Virginia*, in the case of *Alexander* v. *Dencale*, 2 *Munf. R.* 341, the district judge held, that " an *absolute* conveyance of personal estate when the party making it retains possession is void as to creditors, even without other evidence of fraud ; though (he says) this appears to be carrying the matter too far, and perhaps agreeable to ancient determination, it would have been better to have considered it as *evidence* of fraud, connected with other circumstances." This decision was sustained and affirmed by the high court of appeals, but it should be borne in mind that there was no explanation offered or given, why the vendor retained possession. In *Snyder* v. *Gree*, 4 *Leigh's R.* 547, in reviewing this doctrine, the president of the court of appeals says : " Can it be that in these various transactions, so common in the concerns of life, that the purchase is effected with *constructive fraud ?*

I think not. The mischiefs of the rule would be greater than the fraud at which it is aimed, if it be permitted to insinuate itself into such transactions as these;" and he adds : " On either side there is an evil to be avoided, and the most common transactions of life, and the ordinary cases of personal estate will be trammelled and embarrassed, if our sole care is directed to the protection of creditors and purchasers who ought to protect themselves."

In *Kentucky*, the case of *Wash* v. *Medley*, 1 *Dana's R.* 269, Chief Justice Robertson says : " The fact that no visible alteration in the actual possession accompanied and followed the deed, cannot be deemed *per se*, fraudulent. It was a fact proper for the consideration of a jury." In *Baylor* v. *Smithers*, 1 *Little's R.* 112, the court held that on an *absolute* bill of sale, the vendee must take possession, or it would be deemed fraudulent; but if the bill of sale was *conditional*, the question of fraud must be decided by the jury, from the facts of each particular case.

In *Pennsylvania*, the courts seem to have adopted the most rigorous construction of the English rule, which is summed up by Chief Justice Tilghman, in *Danus* v. *Cape*, 4 *Binney*, 258, as follows : " When the deed contains an *absolute* immediate assignment, it is necessary that the possession should accompany and follow it, otherwise it will be fraudulent under the statute 13 *Elizabeth*, and, indeed, at common law ; but when the deed or conveyance is *conditional*, or to take effect at some future time, the retaining of the possession according to the intent of the deed *is not fraudulent*."

In the early decisions of the courts of this state, it was held, that the continuance of the vendor in possession, was only *prima facie* evidence of fraud, and was a circumstance which admitted of explanation. But in *Sturtevant* v. *Ballard*, 9 *Johns. R.* 337, it seems to be supposed that the rule contended for by the respondent in this case, has been sanctioned. This was the case of a sale by a blacksmith of his tools to a merchant, partly for cash, and partly in payment of a precedent debt ; *the bill of sale containing an agreement that the vendor should continue in pos-*

Stoddard *v.* Butler.

*session of the tools three months.* The tools were seized by a crditor upon execution. In the contest between the vendee and the creditor, Kent, Ch. J. says, with emphasis : " There is no case which sanctions such a sale as the one in the present instance ; for here, *no reason whatever* appears for withholding delivery of possession, and the sale must, *therefore* be considered in judgment of law as fraudulent and void against the creditors." And he adds, by way of conclusion, " We may, therefore, safely conclude that a voluntary sale of chattels with an agreement either in or out of the deed, that the vendor may keep possession, is, except in special cases and for special reasons, to be shown to and approved by the court, fraudulent and void as against creditors. This is clearly not one of those cases, and the defendant is, therefore, entitled to judgment." This case, I apprehend, does not go the length which many seem to have supposed. Chief Justice Kent places the decision upon the ground that *"no reason whatever appears for withholding delivery of possession, and therefore the sale must be considered void;"* and the decision is precisely what the revised statutes now declare to be the law. He does not decide, nor assume to decide, what particular facts and circumstances should be proved by way of explanation ; but he clearly admits that the possession in the vendor after sale, may be explained, for he proceeds upon the ground that *"no reason whatever"* was shown in that case.

This whole doctrine passed under the able review of the late Chief Justice Savage, in the case of *Bissel* v. *Hopkins,* 3 *Cowen,* 166. This cause was argued at great length and with distinguished ability, and most of the ancient and modern cases were cited. The chief justice, in alluding to the opinion of the court in *Sturtevant* v. *Ballard,* says : " The learned judge no doubt intended to say here, as in *Barrow* v. *Paxton,* 5 *Johns. R.* 261, that possession continuing in the vendor, is only *prima facie* evidence of fraud, and may be explained. The question in every case is, whether the act done is a *bona fide* transaction, or whether it is a trick and contrivance to defraud creditors. The possession

by the vendor of personal chattels, after the sale, is not conclusive evidence of fraud. The vendee may, notwithstanding, upon proof that the sale was *bona fide,* and for a valuable consideration, and that the possession of the vendor, after such sale, was in pursuance of *some agreement not inconsistent with honesty* in the transaction, hold under his purchase against creditors." This decision has been affirmed by the decisions of the same court in *Jennings* v. *Carter,* 2 *Wendell,* 449, in *Driver* v. *McLaughlin, id.* 596, and in *Hall* v. *Tuttle,* 8 *id.* 375, in which last case the late chief justice again reviews at length the leading cases, and again declares that " possession by the vendor after the sale, is only *prima facie,* and not conclusive evidence of fraud ;" and avers that no case can be found which holds a different rule. *Hall* v. *Tuttle* arose and was tried before the Revised Statutes took effect, but was argued and decided afterwards ; and the chief justice cites the provisions of the Revised Statute applicable to the question, and declares that the provisions are the same as those of the statute of 13 *Elizabeth,* which statute was declaratory of the common law.

In a learned note annexed to the case of *Bissel* v. *Hopkins* by the reporter, now Mr. Justice Cowen, it is said, " The details or circumstances which shall constitute a fraud, like those of usury, or the degree of neglect which shall render a man liable in an action on the case, seem to mock the effects of a general rule, and must be ranged forever without the line which divides the province of the court from that of the jury. The law may declare that fraud shall vitiate the sale; but as the devices by which that fraud is to be compassed and disguised may be various, so the evidence by which it is to be established or repelled may frequently vary with the cases as they arise." And, after reviewing the cases at length, the reporter added, "But whichever way the decisions may tend upon the question of possession in the vender, after a voluntary, direct and *absolute* bill of sale, so far as the statute of *Elizabeth* is concerned, no doubt can be entertained at this day that a continued possession in the mortgagee of chattels, is not *per se* evidence of fraud."

Stoddard *v.* Butler.

I have thus sought to compile all the leading ancient and modern decisions upon this subject, previous to the revised statutes, in the language of the respective courts, for the purpose of exhibiting in a condensed form, what the law has been ; and of correcting by force of authority, the belief that the courts have ever entertained a rule, which in its application must always be harsh and inequitable—or that they have attempted to overrule a principle which, in my judgment, ought to set all human authority at defiance. The supreme court in some recent decisions have, I am compelled to admit, virtually established, or sought to establish, a new and, I may add, severer rule for their government ; but whether it is sought to be maintained by the current of authority, or by some supposed new provision of the revised statutes, does not very clearly appear. I have already shewn what the law has been ; and if, as I have supposed, it has not been essentially changed by the operation of the revised statutes, it seems to me clear that the reasoning of the supreme court in the cases of *Doane* v. *Eddy*, 16 *Wendell*, 522, and of *Randall* v. *Cook*, 17 *id.* 54, (both of which are cited by the respondents' counsel,) are not upheld by the sanction of authority. In the case of *Doane* v. *Eddy*, the case of the travelling preacher, although the mortgagee offered to prove at the trial that the mortgage was given for a valuable consideration, in good faith, and without intent to hinder, delay or defraud creditors, and offered as explanation why the mortgagor retained the possession, that he was a circuit or travelling preacher of the gospel, and that the horse, the subject of controversy, was absolutely necessary to the prosecution of his calling, yet the plaintiff was nonsuited upon the trial, and the supreme court, in a learned opinion delivered by Mr. Justice *Bronson*, (the *Chief Justice* dissenting,) refused to set aside the nonsuit, and held that the proof offered was insufficient to justify possession in the vendor, and that such evidence was, admitting all the facts proposed to be given in evidence to be true, *conclusive evidence of fraud.* In the case of *Randall* v. *Cook*, the only reason given by the vendee why the vendor retained possession was, that the vendor·

wished to *use the horses ;* and this " transaction," says Mr. Justice Bronson, " is fraudulent *in law*—the sentence is written in the statute book, and neither courts nor juries are at liberty to disobey the mandate." The reasons for retaining possession in this case were certainly very slight, and might perhaps be deemed unsatisfactory ; but I can well conceive of cases where even the wish to use property would justify leaving it with the vendor for that purpose, so far as to submit the question of *intent* to a jury. I have been unable to find any sentence in the statute book which virtually condemns without a hearing, which separates conduct from motives, for the purpose of passing judgment upon both, or which executes with its sword before it has weighed in its balances. The statute pronounces judgment only in cases where the mortgagor or vendor continues in possession *without explanation.* The fifth section of 2 *R. S. p.* 136, is as follows : " Every sale of goods made by a vendor of goods and chattels in his possession, or under his control, and every assignment of goods and chattels by way of mortgage or security, or upon any condition whatever, unless the same be accompanied by an immediate delivery, and be followed by an actual and continued change of possession of the things sold, mortgaged or assigned, shall be presumed to be fraudulent and void as against the creditors of the vendor, or against the creditors of the person making such assignment, or subsequent purchasers in good faith ; and shall be conclusive evidence of fraud, *unless it shall be made to appear, on the part of the persons claiming under such sale or assignment, that the same was made in good faith, and without any intent to defraud such creditors or purchasers.*" This section of the statute, I apprehend, leaves the law substantially where it found it. It places absolute and conditional sales upon the same ground, and declares possession in the vendor conclusive evidence of fraud, *unless,* (or rather) *until explained;* or in other words, it throws the burthen of proof upon the vendee, or person claiming under such sale, to shew " that the same was made in good faith, and without any intent to defraud creditors or purchasers." But this question of *intent* is by no means left for

Stoddard *v.* Butler.

the decision of the court, nor is it to be regarded as disputed territory between the court and jury. The fourth section of title third of the same chapter, 2 *R. S.* 137, declares that " the question of fraudulent intent, in ·*all cases*, shall be deemed a question of fact and not of law. In addition to this clearly defined intention of the legislature as to the validity of bills of sale or chattel mortgages, when given in good faith and without any intent to defraud creditors or purchasers, it is worthy of remark that the last act passed by the colonial legislature of New-York was to provide for the registry of chattel mortgages, and that the legislature in 1833, with a view to correct abuses, passed an act requiring them to be placed on file in the town where the mortgagor should reside, clearly contemplating that the goods were to remain in the possession of the mortgagor or vendor. While it is certain that the question of fraudulent intent is one of law, where the vendor retains possession and no explanation is offered ; it is equally clear that the question of intent, when an *explanation is offered*, is a question of fact. The former is the prerogative of the court, and the latter of the jury. It is only necessary for the person claiming under such sale to shew " that the same was made in good faith, upon sufficient consideration, and without any intent to defraud ;" and of the *intent* and *good faith* the jury are the exclusive judges. This " *sentence* is written in the statute book, and *courts* are not at liberty to disobey its mandate." It is undoubtedly the province of the court to pass upon the evidence offered in this as in all other cases, and no further ; and when they have instructed the jury that the law pronounces the transaction fraudulent, unless they are satisfied that the evidence rebuts all presumption of fraudulent intent, they have discharged their office, and it is for *the jury* and not for the court to say, whether the transaction was fair and without intent to defraud. The benefits of this salutary rule may be as effectually destroyed by its misapplication, as by refusing to acknowledge its existence. If courts are to acknowledge the abstract principle merely, and then destroy 'ts operation by laying their hands on every transaction which

Stoddard *v.* Butler.

would ordinarily come within its provisions, and thus subvert the very spirit and intention of the statute, the sooner it is abrogated entirely, the better. The statute, to my understanding, offers its protection to honesty and fair.dealing, in all cases where it is so pronounced by the solemn verdict of a jury; but the rule will prove a delusive mockery, if courts are so to.construe the statute as to sweep away the only matter fitted for their consideration. In short, I am unable to discover what power the statute has given the court to determine what particular facts shall or shall not be sufficient evidence of honest intention; nor do I hesitate to declare that any facts, which impress the mind with a conviction that the sale was honest and *bona fide*, and was not designed as a mere trick to cover property for the purpose of defrauding creditors, should be submitted to the jury. While such evidence should be subjected to the severest scrutiny, the jury have a right to pass upon it; and if, against the presumption of law, from the explanations given, they find it honest and *bona fide*, their verdict ought to be conclusive.

Neither the legal nor the moral code should be administered for the sole benefit of creditors. They become creditors by their own volition, and have abundant means for their own protection; nor can I consent to place the general creditor, upon a superior footing to him who furnishes his poor neighbor with a cow to nourish his children, or a team to sow his crops or gather in his harvest. If the commercial interest of this country cannot be sustained without trampling upon all others, and the ordinary charities of life besides, the sooner it finds its level the better. It is an idle dream to suppose we can advance the cause of morals, by establishing a rule which ministers to the mercenary passions at the expense of the benevolent affections, or that the fountain of justice will send forth purer streams if they are forced to flow through artificial channels. The principles of law are but the enlightened and just conclusions of a moral people, pronounced by their own tribunals, and when the law seeks to erect a standard of its own, and ceases to exert its attributes in administering to the public good, the same hand which upholds it will not fail

Stoddard *v*. Butler.

to divest it of its power to oppress. It will then be seen, how utterly unavailing is the attempt to divide honesty into chapters, or to define morality by sections. Sacred scripture has declared that the poor we shall always have with us, and charity to our fellow men is therein strongly inculcated ; but whether the doctrine under consideration is calculated to give force to this divine declaration, by compelling the affluent to retain their goods exclusively in their own possession, upon pain of forfeiture to a stranger, or to counteract its truth by making the possessor of goods, under all circumstances, the owner, it is perhaps difficult to determine.

If this rapacious principle of law, which sets all motives and intentions at defiance, is to obtain, it should at least lay down some outlines for its own government. It ought to declare how far the owner may safely entrust his chattels from his person before the title steals from him, *nolens volens*, by operation of law; and for how great a period of time they may so remain out of his possession, before the title to his property will pass from him. If facts and circumstances are unavailing, and courts are to dispose of this class of cases without the intervention of a jury, a Procrustean couch should be fitted for their reception, and extension or amputation bring them to a common standard.

In *Randall* v. *Cook*, Mr. Justice Bronson says, " Had it been declared fifty years ago, that if a man conveyed his personal chattels and still kept them himself under any pretence whatever, the transaction should be deemed absolutely fraudulent and void as against creditors and purchasers, it would have saved an incalculable amount of time and money which has been expended in the litigation of questions of this kind ; and it would moreover have rendered a most important service to the cause of good morals, by removing all temptation to the numberless frauds which have been committed for the purpose of placing property beyond the reach of legal process." While I acknowledge the force of reasoning adopted by the learned and esteemed judge, I am compelled to remark, that if at the same time the law had laid its interdiction upon all human intercourse as to exchanges

or purchases of property, the same result would have been pro-duced, and with about equal justice and propriety. If fifty years ago, the law had laid aside its metaphysical subtleties, and re-vealed itself in its own simplicity and purity—if it had, regard-less of form, pronounced appropriate judgments upon honesty and fraud, it would have won more by its justice than it has ter-rified by its power. There cannot well be two standards of truth and morals—the one for courts of justice and another for the people in their ordinary intercourse. If by the inquisitions of the judicial crucible, a transaction both honest and fair may be alloyed until it is dishonest and fraudulent, by the inverse power of transmutation, a fraud may be refined until it is equivalent to honesty and truth. If truth may become constructive falsehood, by the same rule falsehood may become constructive truth. If the *possession* of personal chattels is, or ought to be, *conclusive* evidence of ownership, it is also, or ought to be, *conclusive* evi-dence that a person *not in possession is not the owner.* All, then, that remains for the fraudulent debtor to do, who would *conclu-sively* place his chattels beyond the reach of execution, is to place them in the *possession* of his friend against whom no process has been issued, and it is done.

It was said by counsel upon the argument of this cause that the rule contended for by the appellants would tend to produce and encourage litigation and multiply suits, and for this reason would be upheld by the legal profession ; that its adoption would tend to make expense and delay in the collection of debts, while the reverse would be productive of much utility and economy. It may be said with equal propriety that if our system of juris-prudence was exchanged for the arbitrary laws of the east ; if our courts and juries were dispensed with, and justice measured out by the nod of the lawgiver, and executed by the baston and bow-string, our administration of justice would be more summary as well as more economical, and the services of the legal profession might be altogether dispensed with.

This being an appeal from chancery, it is our duty as a court of equity, to pass upon both the law and the fact. The law has been

Stoddard *v.* Butler.

already discussed, and although leaving the goods in the posses-
sion of Stoddard was conclusive evidence of fraud until ex-
plained ; when it was explained it was so no longer.   I repeat,
I am disposed to regard the *bona fides* of the transaction as abun-
dantly proved by the pleadings, or rather by the answer, which
is evidence.   It is fully established that the assignment was not
made for the purpose or with the intent to hinder or defraud
creditors, but in payment of an actual debt, and that the pro-
perty was left with Stoddard as the agent of Thurber and Town-
send for the sole purpose of closing up the business for their
benefit, without disguise or concealment.   This, in my judgment,
ought to satisfy a jury of the fairness and honesty of the transac-
tion, and that the assignment was not made for the purpose or
with the intent to hinder or defraud creditors, which under the
view I have taken is all that is necessary.   I discover nothing in
this matter at war with law, equity or good morals ; I am, there-
fore, for reversing the decree of his honor the chancellor, and of
affirming the decree of the vice-chancellor of the fifth circuit.

By Senator VERPLANCK.   The history of our law respecting
the rights of creditors in relation to the property of their debtor,
sold, assigned or mortgaged by him, but remaining in his posses-
sion and under his control, is remarkable.   It presents a perpe-
tual struggle between a general rule of policy, intended to cut
off the possibility of fraudulent or collusive sales, prescribing
either legislatively or judicially that every sale, assignment or
mortgage, unaccompanied by change of possession, should be
held fraudulent in the eye of the law, and void against creditors ;
and on the other side, the obvious hardship and injustice of nu-
merous particular cases where the innocent and even benevolent
intention of the party was manifest, and the legal presumption
of fraud appeared inequitable, oppressive, contrary to the truth
of the case, and the moral feelings of those who must apply and
enforce the law.   Thus it happened here and in England, that
whilst the courts and the books laid down the rule broadly, and
often applied it strictly, that " unless possession accompanies and

Stoddard *v.* Butler.

follows the deed, it is fraudulent and void," (in the words of Justice Buller, *Edwards* v. *Harben*, 2 *T. R.* 587, adopted and incorporated in our own statute,) yet first, case after case, and then class after class of exceptions was exempted from the rule, until with us there were no less than twenty-four distinct grounds of exemption ; such as the kind of sale, purchase under execution, or distress for rent, necessity, convenience, the custom of trade, the distance or situation of place, the relation of parties, motives of humanity or of friendship, and special circumstances of various kinds more or less definitely defined, all enumerated by Judge Cowen, 3 *Cowen,* 190.

In the revision of our own statute law, it was attempted to settle all these doubts and discrepancies by positive legislation and strict definition. Accordingly, the learned revisers, returning to the strict policy of the old law, and the doctrine laid down in *Edwards* v. *Harben,* recommended that " all sales or mortgages not accompanied by an immediate delivery, and followed by an actual and continued possession, should be void against the creditors of the vendor," and this without any exception, and excluding all explanation. *See Revisers' Report,* 3 *R. S.* 657, 2d ed. But the same considerations of natural equity which had so often induced courts to break in upon the legislative and judicial rules of legal policy, had again equal weight with the legislature, so that in adopting the section recommended by the revisors, they added at the end a clause of exception, enabling the person claiming under the sale or assignment, to rebut the legal presumption of fraudulent intention by positive evidence of the good faith of the transaction. It was accordingly enacted first, nearly in the strong and comprehensive language of the revisers, that every sale of goods and chattels, and every assignment by way of mortgage or security, "unless the same be accompanied by an immediate delivery, and be followed by an actual and continued change of possession, shall be pronounced to be fraudulent and void as against creditors or subsequent purchasers, and shall be conclusive evidence of fraud." Then the legislature, of its own motion, added the excepting and

Stoddard *v.* Butler.

qualifying clause; " unless it shall be made to appear on the part of the person claiming under such sale or assignment, that the same was made in good faith, and without any intent to defraud such creditors or purchasers." This question of fraudulent intent, a subsequent section enacts, shall be a question of fact, and not of law ; which is a legislative declaration of what has of late been judicially held to be the sound law. These enactments were thought to have settled the law conclusively, and so they appear to have been considered by Chancellor Kent, in his Commentaries, who, after giving the history of the fluctuations of legal decision, adds, " The New-York Revised Statutes have put this vexed question at rest, as to the effect of non-delivery on sale or assignment. 2 *Kent's Comm.* 529. But this legislation has merely afforded a new and remarkable proof of the imperfection of human language, and the impossibility of definitely settling any great rule of law for the complicated affairs of human life, merely by the general language of a statute, or the provisions of a code.

The volumes of our reports, and still more, the actual litigation of our inferior courts, and the doubts and difficulties of men of business, as well as of their professional advisers, give ample demonstration that the law, clearly as it would seem to be enacted, is still fluctuating and doubtful. The decisions in this state since the statute of 1830, have, it seems to me, been more in the spirit of the learned revisers than in that of the enacting sovereign power. They have, I think, gone to lay down legal rules, necessarily general and artificial, to govern the decision of the particular question of intent which is expressly declared to be one of fact ; and they have tended to confine the qualifying and excepting clause of the statute, allowing exculpatory evidence, to the narrow limits of absolute necessity of continued possession. As between the official revisers and the revising legislature, this was an open question. The revisers were induced by considerations of public policy, to propose a strict and undeviating universal rule, which would exclude all possible fraud, even at the expense of occasional hardship and severity

towards innocent parties. The legislature endeavored to adopt that rule with such a modification as might prevent its hard and inequitable operation in special cases. Weighty arguments and high judicial authorities might be urged for either view of the question. But these are no longer applicable. It is not the question of legislative policy that the courts have now to examine, but that of pure statutory interpretation. Upon this, the older decisions may throw some light ; but the history of the enactment itself is a surer guide to the meaning of the legislature, if indeed it has not been clearly expressed in the language of the statute. As the decisions on the statute of 1830, are all recent, not yet wrought into the body of our law, nor familiar to the knowledge and practice of men of business, and as none of them have been made or adopted in this appellate court, I shall not consider them in detail, but am satisfied to consider the subject as *res integra* here, and to examine the statute as it stands in the books, without considering the late decisions of our own courts as of binding force, and regarding the older ones as important, chiefly as they point out the intention and explain the language of the statute.

The language of the statute has something of contradiction, indicating the double parentage of the two portions of the section, and this may explain the fact of the very different interpretation given to it by learned judges from that of the mass of business men who are to be governed by it. The absence of a change of possession, it is said, " shall be presumed fraudulent, and to be conclusive evidence of fraud." Now a conclusive presumption is defined to be, " a legal rule not to be overcome by any evidence that the fact is otherwise ;" like the presumption of payment, for instance, under our statute of limitation. No contradiction or explanation is admissible, or if admitted would be of any avail. It is the *presumptio juris et de jure* of the civilians which in their language, " *probationem contrariam haud admittit;*" and such was probably the meaning of the revisers. But as the law was actually enacted, it goes on expressly to allow that the only conclusive presumption in question may be

Stoddard *v.* Butler.

repelled by positive proof to the contrary. The presumption of fraud, then, (although from some of the language of our courts, I should think they viewed it otherwise,) must be considered only as a presumption of fact, a legal evidence of fraud, conclusive in the absence of contradictory testimony, but open to refutation. It is only, as Lord Mansfield defined the legal presumption of a grant raised by many years' enjoyment, to be, " such a presumption, that unless contradicted or explained, the jury ought to believe it." Here the whole burden of proof is thrown upon the claimant under the sale, and he must " make it appear" that he acted in good faith. I think the words require that it shall not be a mere matter of inference that he did so act, but that he must give such *external evidence* of good faith in that transaction as its nature will admit. It is strictly under our statute a question of fact, such as a jury may judge of, and must alone do so, if the question comes before a court of common law; and any decision going to substitute an arbitrary rule of general policy or of legal presumption, to the evidence itself, must be unsound. If, then, there be positive evidence of a fair and full consideration paid, of the existence of reasonable motives for not requiring delivery, such as may and do sway honest men—for instance, filial or parental or brotherly affection, or the convenience and usage of business, together with that publicity which excludes the idea of intended evasion of law, or holding out false credit—all the requisitions of the statute seem to me to be fully complied with, in the strictest agreement with its letter, and in perfect conformity with its spirit, intention and policy.

In the present case, Thurber & Townsend, merchants of Utica, received from Stoddard, a village retailer in another county, who was indebted to them, an assignment of the remnants of his goods, and of numerous small outstanding debts due him, of two dollars and upward, " for and towards the payment and satisfaction of said debt." Stoddard was left in possession as an agent to sell the goods, and collect the debts for the benefit of the assignees, for which he was to receive a reasonable compensation. The question now is, whether the assignment be void against a

subsequent judgment creditor.  If it be so, it must either be from the presumption of fraud declared by the statute, or from the excess of value of the goods and debts assigned above the actual amount of the debt due, giving proof of an actual fraudulent intent.  The chancellor has decided against the validity of the assignment on both grounds.  The vice chancellor, who first heard the case, thought otherwise.  I agree with his view of the value of the assigned assets ; $1200 of debts, more than one-fourth confessedly bad, another part doubtful, and the rest scattered among an hundred individuals or more, about a thinly settled country, some probably subject to set offs, all requiring some trouble and delay, many some actual expense in collecting ; together with $430 worth of goods, the refuse of an old stock valued at cost, not at New-York, but at prices at a secondary neighboring market, and goods too which would scarcely bear the expense of transporting to a place where they might be sold with less trouble and delay, might well be considered as hardly an equivalent to discharge a cash debt of $635.  I assent to all the reasoning of the vice chancellor on this point as conclusive. Besides the offer of the appellants before suit to give up the property on payment of the debt, which was rejected, shows the estimate placed by all parties on the property assigned.  On them, at least, it ought to be conclusive.  Nor is the very trifling amount of goods sold and debts collected by the agent during three months, a slight additional circumstance to show the difficulty of realizing the assigned assets.

Secondly.  As to the legal presumption of fraudulent intent prescribed by the statute : I conceive the evidence of such intent arising from want of a change of possession to be repelled : 1. By the legality of the assignment *per se* for a *bona fide* debt, of assets of doubtful value, though of a nominal amount, exceeding that of the debt for which they were assigned.  2. By the strong proof of the publicity of the assignment, and of the employment of Stoddard as a mere agent, as appears in the cross-examination of the witnesses.  Such publicity has always been held one of the strongest evidences of good faith, even from the time of Lord

Coke, who in *Twyne's case*, when this principle of constructive fraudulent intent was first asserted, points out a secrecy as a mark of fraud, and publicity as the first precaution to be used in order to protect a *bona fide* assignment in satisfaction of prior debts. 3. By the necessity of the case ; the leaving the goods in Stoddard's possession, and the debts to be collected by him, for a time, being apparently essential to the realizing of any considerable amount from them. An agent at Lowville was necessary, and he was probably the best.

From all these considerations, I think the appellants have given the external proof required by law to repel the presumption of fraud, and have made it appear " that the transaction was in good faith, and without any intent to defraud creditors or purchasers." I am therefore of opinion that the vice chancellor was correct in dismissing the complainants' bill, and that the decree of the chancellor should be reversed.

Senator YOUNG expressed his full concurrence in the views taken by the judges of the supreme court, who had just delivered opinions. He considered the question presented in this case as highly interesting, bringing under consideration what transfers shall be deemed fraudulent and what fair, not only in respect to creditors, but to the community at large, who may by false appearances be induced to part with their property, and then defrauded of their dues. He deemed the question important, also, in the view of public morals. He said, sympathy for the poor and unfortunate had been invoked, and the feelings of humanity appealed to, but he said it would be false sympathy and squeamish humanity to support, as legal, transactions like this, so well calculated for the perpetration of frauds. The case under consideration, he said, would not have stood the test of judicial enquiry as long since as 250 years ago, when *Twyne's case* was decided. Then the proportion of personal in comparison with real property was small, commerce was limited, and imprisonment for debt allowed ; and yet in that case, in many respects, not more strongly marked with fraud than the present, the sale was ad-

Stoddard *v.* Butler.

judged void. If such was the law then, surely it should not now be relaxed, when so great a proportion of the prop erty of the country consists in personalty, and commercial transactions pervade the whole community, when imprisonment for debt is abolished, and even a certain portion of the debtor's property is exempted from execution.. The extent of traffic in the country, and the state of the laws as between debtor and creditor, give facilities to the perpetration of frauds ; and as those increase, the laws intended for the protection of the honest portion of the community should be more rigorously enforced. For these reasons, he was for an affirmance of the decree of the chancellor.

On the question being put, *Shall this decree be reversed ?* the members of the court divided as follows :

*In the affirmative :* Senators DICKINSON, FURMAN, HAWKINS, HULL, HUNT, HUNTINGTON, N. JOHNSON, JONES, LEE, H. A. LIVINGSTON, NICHOLAS, VERPLANCK—12.

*In the negative :* The PRESIDENT of the Senate, Mr. *Justice* BRONSON, Mr. *Justice* COWEN, and *Senators* EDWARDS, HUNTER, E. P. LIVINGSTON, PAIGE, SPRAKER, STERLING, TALLMADGE, WAGER, YOUNG—12.

Whereupon the decree of the chancellor was AFFIRMED.